

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| VIRGINIA DEPARTMENT OF TRANSPORTATION, ET AL, <br><br> Plaintiffs, <br><br> -v- <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL, <br><br> Defendants. | Civil Action No. 1:12-CV-775 |

### Memorandum Opinion

Before the Court is the Plaintiffs' motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The Defendants opposed the motion, and the Plaintiffs replied. The Court heard oral arguments on December 14, 2012 and now issues this memorandum opinion and accompanying order granting the Plaintiffs' motion.

### Background

The Clean Water Act, 33 U.S.C. § 1251 et seq., establishes the basic structure for regulating discharge of pollutants into the waters of the United States, and provides certain mechanisms to improve and maintain the quality of surface waters.

One such mechanism is the requirement that states identify "designated uses" for each body of water within their borders, as well as "water quality criteria" sufficient to support those uses. 33 U.S.C. § 1313(c)(2)(A). The Environmental Protection Agency ("EPA") evaluates the uses and criteria developed by the states, and either approves them or else proposes and

1

promulgates its own set of standards. § 1313(c)(3).

Once the standards are in place, each state is required to maintain a list—also subject to approval or modification by EPA—of its waterbodies that are "impaired" because they do not meet their respective water quality criteria. 33 U.S.C. § 1313(d)(1)(A). For each waterbody on the impaired list, the state is required to establish a set of total maximum daily loads ("TMDLs") sufficient to bring the body back into compliance with its water quality criteria. § 1313(d)(1)(C). Each TMDL establishes the maximum amount of a pollutant that may be added to the waterbody daily from all sources (runoff, point sources, etc.). EPA is required to publish a list of pollutants suitable for maximum daily load measurement, § 1314(a)(2)(D), and it has determined that *all* pollutants are suitable for TMDLs, *see* Total Maximum Daily Loads Under Clean Water Act, 43 Fed. Reg. 60,662. Therefore, any pollutant that falls within the relatively broad definition of "pollutant" set forth in § 1362(6) may be regulated via TMDL. EPA can approve or modify as it sees fit TMDLs proposed by the states. § 1313(d)(2).

Here the state in question is Virginia, and the waterbody is a 25-mile long tributary of the Potomac River, located in Fairfax County, called Accotink Creek. The creek has been the subject of litigation in the past that is not relevant to this matter except the result: EPA was required to set TMDLs for Accotink Creek once Virginia failed to do so by a certain date. Specifically, the creek had been identified as having "benthic impairments," which is to say the community of organisms that live on or near the bottom of the creek were not as numerous or healthy as they should be. EPA was to set appropriate TMDLs to improve the health of the benthic community in Accotink Creek.

On April 18, 2011, EPA established a TMDL for Accotink Creek which limited the flow rate of stormwater into Accotink Creek to 681.8 $ft^3$/acre-day. The TMDL was designed to

regulate the amount of sediment in the Accotink, because EPA believed sediment was a primary cause of the benthic impairment. Both parties agree that sediment is a pollutant, and that stormwater is not. EPA refers to stormwater flow rate as a "surrogate" for sediment.

The Plaintiffs are now challenging the TMDL on multiple grounds, but presently before the Court is a single issue: Does the Clean Water Act authorize the EPA to regulate the level of a pollutant in Accotink Creek by establishing a TMDL for the flow of a nonpollutant into the creek?

## Analysis

### I. Standard of Review

Count I of the complaint, at issue here, is brought under the Administrative Procedures Act. *See* Comp. ¶ 169. The APA "confines judicial review of executive branch decisions to the administrative record of proceedings before the pertinent agency." *Shipbuilders Council of Am. V. U.S. Dept. of Homeland Sec.*, 770 F. Supp. 2d 793, 802 (E.D. Va. 2011). As such, the district court "sits as an appellate tribunal," and APA claims can be resolved equally well in the context of Rule 12 or Rule 56. *Univ. Med. Ctr. Of S. Nev. V. Shalala*, 173 F.3d 438, 441 n. 3 (D.C. Cir. 1999).

Because Count I presents a question of statutory interpretation, the Court reviews EPA's decision using the two-step analysis set forth in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). For a given question of statutory interpretation, the first step under *Chevron* is to determine whether Congress addressed the "precise question at issue." 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter . . . ." *Id.* If the Court cannot find that Congress has squarely addressed the question, the Court must move to Chevron's second step. In

the second step of statutory construction under *Chevron*, the Court must determine whether the agency's interpretation of the statute is "permissible." *Id.* at 843. The agency's construction is permissible if it is reasonable, but it need not be what the Court considers the *best* or *most reasonable* construction. *See id.* at 845. The Court is not to simply impose its own construction on the statute, but instead it gives deference to any reasonable statutory construction by the agency. *Id.* at 843.

## II. Chevron Step One

Whether statutory ambiguity exists so that the issue cannot be settled at *Chevron's* first step is for the Court to decide, and the Court "owe[s] the agency no deference on the existence of ambiguity." *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005). The Court begins the inquiry by "employing traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. As always, the analysis begins with the text of the statute. *Nat'l Elec. Mfrs. Ass'n v. U.S. Dept't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011).

The text of the statute that requires states to establish their own TMDLs, 33 U.S.C. § 1313(d)(1)(C), is:

> Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, **the total maximum daily load, for those pollutants which the Administrator identifies** under section 1314(a)(2) of this title as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality. (emphasis added)

The next subsection, § 1313(d)(2), grants EPA the authority to set TMDLs when the state

4

has not done so adequately. "Pollutant" is a statutorily defined term. 33 U.S.C. § 1362(6).

The Court sees no ambiguity in the wording of this statute. EPA is charged with establishing TMDLs for the appropriate pollutants; that does not give them authority to regulate nonpollutants. The parties agree that sediment is a pollutant under 33 U.S.C. § 1362(6), and stormwater is not. Then how does EPA claim jurisdiction over setting TMDLs for stormwater?

EPA frames the stormwater TMDL as a surrogate. EPA's research apparently indicates that the "[sediment] load in Accotink Creek is a function of the amount of stormwater runoff generated within the watershed." Def. Opp. at 8. And EPA believes that framing the TMDL in terms of stormwater flow rate is superior to simply expressing it in terms of maximum sediment load.

The DC Circuit has considered and rejected a similar attempt by EPA to take liberties with the way Congress intended it to express its TMDLs. In *Friends of the Earth, Inc. v. Env. Protection Agency*, EPA had promulgated TMDLs for the Anacostia River that expressed the maximum load of certain pollutants in terms of annual and seasonal amounts. 446 F.3d 140, 143 (D.C. Cir. 2006). The court found that expressing a TMDL in terms of annual or seasonal maximums was not allowed, because the statute granted authority only for daily loads. *Id.* at 148. The court reached its conclusion even though EPA apparently made a strong argument that expressing TMDLs in terms of annual or seasonal loads was an effective and reasonable approach. *See id.* Presumably a daily load could have been derived by simply dividing the annual load by 365, yet the court still required expression in the terms dictated by Congress.

Here too, EPA hopes to express a TMDL in terms other than those contemplated by the statute, arguing that such an expression is the most effective method. But, as *Friends of the Earth* illustrates, EPA may not regulate something over which it has no statutorily granted power—

5

annual loads or nonpollutants—as a proxy for something over which it *is* granted power—daily loads or pollutants.

EPA's argument that its surrogate approach should be allowed because the statute does not specifically forbid it fails. EPA is not explicitly forbidden from establishing total maximum *annual* loads any more than they are explicitly barred from establishing TMDLs for nonpollutants. The question is whether the statute grants the agency the authority it is claiming, not whether the statute explicitly withholds that authority. And in this case, as in *Friends of the Earth*, the statute simply does not grant EPA the authority it claims.

The dicta in *Weyerhaeuser Co. v. Costle* is not as helpful to EPA's case as it would like. 590 F.2d 1011, 1022 n.6 (D.C. Cir. 1978). It is true that the court said in a footnote "[i]t is well recognized that EPA can use pollution parameters that are not harmful in themselves, but act as indicators of harm." *Id.* But in that case, the non-harmful pollution parameters the EPA sought to regulate were components of the effluent commonly discharged from paper mills, *id.* at 1022, making them effluents themselves. And power to regulate effluents is expressly granted to the EPA in the relevant statutory section. *See* 33 U.S.C. § 1314(b).

EPA would like to create the impression that Congress has given it loose rein to determine exactly what it could and could not regulate. On page 16 of its opposition to this motion, EPA points out that "Congress authorized EPA to determine which pollutants were suitable for TMDL calculation and measurement." (Internal quotes removed). While this may be true, EPA glosses over the fact that 33 U.S.C. § 1314(a)(2)(D) only gives EPA the power to regulate pollutants as that term is defined—by Congress—elsewhere in the statute. And, as discussed above, sediment is a pollutant for these purposes, but stormwater is not.

In a similar vein, EPA regulations which imply that the agency has discretion to set the

TMDL as it sees fit do not bear on the question now before the Court. EPA has promulgated a regulation allowing TMDLs to be "expressed in terms of either mass per time, toxicity, or other appropriate measure," 40 C.F.R. § 130.2(i), and another that allows TMDLs to be expressed as a "property of pollution," 50 Fed. Reg. 1774, 1776 (Jan. 11, 1985). But, EPA citing these regulations to demonstrate that the surrogate TMDL approach is permissible is mere bootstrapping. To the extent the regulations allow EPA to set TMDLs for nonpollutants, they exceed the statutory authority of EPA.

The plain language of the statute trumps all, but legislative history also supports Plaintiffs' argument. Congress's intent to limit EPA's discretion in this context is evidenced by the committee record cited by Plaintiffs, which has also been used by the Ninth Circuit, in which Senator Randolph, Chairman of the Senate committee that amended the act in 1972, explained, "We have written into law precise standards and definite guidelines on how the environment should be protected. We have done more than just provide broad directives [for] administrators to follow." Pl. Mot. 7, citing Nw. Envtl. Def. Ctr. v. Brown, 640 F.3d 1063, 1072 (9th Cir. 2011). Congress created a statutory scheme that included a precise definition of the word "pollutant," and then gave EPA authority to set TMDLs for those pollutants. Senator Randolph's comments strongly imply that Congress did not intend anything more or less than what is written in the statute.

The Court considers the language of 33 U.S.C. § 1313(d)(1)(C) to be unambiguous. Congress has spoken directly on the question at issue, and its answer is that EPA's authority does not extend to establishing TMDLs for nonpollutants as surrogates for pollutants. The legislative history of the CWA is consistent with this reading. Therefore, this Court finds EPA's interpretation of § 1313 and the related provisions to be impermissibly broad based on analysis

under the first step of *Chevron* analysis.

**III. Chevron Step Two**

Because the Court considers Congress's intent to be clear and unambiguously expressed by the language of the statute, it need not move to the second step of *Chevron* analysis. But the Court notes that there is substantial reason to believe EPA's motives go beyond "permissible gap-filling."

Page 9 of EPA's opposition says, "stormwater flow rates as a surrogate would more effectively address the process by which sediment impairs aquatic life in Accontink Creek." If the sediment levels in Accotink Creek have become dangerously high, what better way to address the problem than by limiting the amount of sediment permitted in the creek? If sediment level is truly "a function of" the amount of stormwater runoff, as EPA claims, then the TMDL could just as easily be expressed in terms of sediment load.

In fact, the Board of Supervisors of Fairfax County argued at the December 14th hearing (without objection from EPA) that EPA has approved 3,700 TMDLs for sediment nationwide, and in Virginia has addressed 111 benthic impairments with TMDLs. None of them regulated the flow rate of stormwater. By comparison, EPA has tried out its novel approach of regulating sediment via flow in only four instances nationwide, and all four attempts were challenged in court. One has settled, the other three are still pending.

The Court suspects that the decision to regulate stormwater flow as a surrogate for sediment load would not constitute a permissible construction of § 1313(d)(1)(C), even given the deference due at *Chevron's* second step. This is especially likely because EPA is attempting to increase the extent of its own authority via flow TMDLs, which courts must examine carefully.

8

See *Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 161-62 (4th Cir. 1998). EPA's attempt to set TMDLs for nonpollutants probably goes beyond "permissible gap-filling" and is instead an impermissible construction of the statute.

## Conclusion

The language of § 1313(d)(1)(C) is clear. EPA is authorized to set TMDLs to regulate pollutants, and pollutants are carefully defined. Stormwater runoff is not a pollutant, so EPA is not authorized to regulate it via TMDL. Claiming that the stormwater maximum load is a surrogate for sediment, which is a pollutant and therefore regulable, does not bring stormwater within the ambit of EPA's TMDL authority. Whatever reason EPA has for thinking that a stormwater flow rate TMDL is a better way of limiting sediment load than a sediment load TMDL, EPA cannot be allowed to exceed its clearly limited statutory authority. For these reasons, the Plaintiffs' motion for Rule 12(c) judgment on the pleadings on Count I of their complaint is granted.

January 3, 2013
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge